*Decision will be entered under Rule 50.*

HERMAN SHUMLIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23368.   Promulgated February 20, 1951.

*Jacob Rabkin, Esq.*, for the petitioner.
*Sheldon V. Ekman, Esq.*, for the respondent.

408

## OPINION.

Opper, *Judge:* The characterization of petitioner's contract rights as "property" contributes little to resolving whether petitioner's arrangement with Warner Bros. resulted in capital gain or ordinary income. A legal right or claim can be received under such circumstances that its fair market value constitutes ordinary income, regardless of its character, as for example, when it is the form in which payment for personal services is received, Regulations 111; section 29.22 (a)-3, and by the same token such a claim may become income not when it is received, but when it is converted into cash. *Helvering* v. *Eubank*, 311 U. S. 122; *Shuster* v. *Helvering* (CCA-2), 121 Fed. (2d) 643.

In our view the latter description of the underlying events most nearly conforms with the present record. Petitioner's power to share in the proceeds of the successful production of "Watch on the Rhine" was due in the first instance to his contribution of services as its producer. See *Irving Berlin*, 42 B. T. A. 668. And the facts that a part of the proceeds originally took the form of a share in royalties for a license to employ the material in a motion picture, see *Commissioner* v. *Strauss* (CCA-2), 168 Fed. (2d) 441, and that eventually petitioner received a lump sum in substitution, fail to deprive the whole transaction[1] of that basic character. *Shuster* v. *Helvering*,

---

[1] The specific details were, as our findings show, somewhat complicated. Under his contract with the playwright, petitioner became entitled to a share of the proceeds of any sale of motion picture rights she might arrange, his objections to a proposed motion picture release date to be given due consideration. The playwright's first contract with Warner Bros. provided for the payment of cash installments in fixed amounts as well as a percentage of motion picture receipts. Before all fixed installments had been paid and prior to the release of the picture, Warner Bros. and the playwright entered into a subsequent agreement which substituted additional cash payments in fixed installments for the percentage arrangement. This agreement stated that petitioner's Company had approved the first contract and consented to the substitute arrangement. Warner Bros. desired petitioner to be a party to this agreement, and he agreed, if his Company were to be paid its share first. Under this agreement, in which petitioner joined, he continued to be entitled to a share in the remaining installments due under the lump-sum payment provision of the playwright's first contract with Warner Bros., while his rights in the percentage payments were released and he became expressly entitled to additional fixed cash payments, the receipt of which by him during the year in controversy gives rise to this dispute.

*supra.* Nor can it be said that when the payment was received in the tax year, it was in exchange for a complete assignment of all copyright interests [2] even if that should be material,[3] nor that the agreement with Warner Bros. did not deal with subject matter in the nature of petitioner's stock in trade. *Goldsmith* v. *Commissioner* (CCA–2), 143 Fed. (2d) 466, certiorari denied, 323 U. S. 774.

While it may be true that petitioner previously had no direct contract with Warner Bros., it seems evident from the conduct of the parties that his interest in the entire transaction was sufficiently immediate and direct so that Warner Bros. insisted upon a release by him and was prepared to and did pay substantially for the abandonment of his rights. The result was that there was in effect merely a novation [4] by which the indeterminate payments to which petitioner had previously been entitled were converted into a single lump sum which he received in the year in issue. See *Escher* v. *Commissioner* (CCA–3), 78 Fed. (2d) 815; *George K. Gann*, 41 B. T. A. 388; *Thurlow E. McFall*, 34 B. T. A. 108; *Shuster* v. *Helvering, supra.* "The 'purchase' of that future income did not turn it into capital, any more than the discount of a note received in consideration of personal services. The commuted payment merely replaced the future income with cash." *Helvering* v. *Smith* (CCA–2), 90 Fed. (2d) 590, 592.

No violation of the legislative design can result from this treatment. The special lenience with respect to capital gains has its genesis in the possibility that since increases in the value of capital assets may cover a number of years, taxation of the total gain in any one year is inequitable. See House Report No. 350, Ways and Means Committee, 67th Cong., 1st Sess., 10. A similar approach now exists to the compensation for personal services rendered over a term of years. Section 107, Internal Revenue Code. If petitioner's situation fails to entitle him to that gentler treatment, it does not call for distortion into something which it is not, but merely confirms the conclusion that it was not the statutory purpose to grant special privileges under such circumstances as these.

As to the second issue, our finding of fact that petitioner actually expended the claimed amounts in furtherance of his business as a producer is dispositive. In this respect the deficiency must be disapproved.

*Decision will be entered under Rule 50.*

---

[2] See *Commissioner* v. *Hopkinson* (CCA–2), 126 Fed. (2d) 406.

[3] Cf. *Joseph A. Fields*, 14 T. C. 1202.

[4] A release or extinguishment of an obligation is not ordinarily treated as a sale or exchange under section 117. *Fairbanks* v. *United States*, 306 U. S. 436; *Hale* v. *Helvering* (CA–DC), 85 Fed. (2d) 819.